CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

**DEC 26 2018**

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Danville Division

| | | |
|---|---|---|
| KEVIN D., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00068 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY BERRYHILL, | ) | By:   Joel C. Hoppe |
| Acting Commissioner, | ) | United States Magistrate Judge |
| Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Kevin D. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the

parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's

decision is supported by substantial evidence and should be affirmed.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

2

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Kevin D. filed for DIB and SSI in November 2013. *See* Administrative Record ("R.") 182–84, 185–88, ECF No. 9-1. He alleged that he had been disabled by lumbar radiculopathy and lower back pain since August 26, 2011. R. 62–63, 73. Disability Determination Services ("DDS"), the state agency, denied his claims initially in May 2014, R. 62–72, 73–85, and upon reconsideration that December, R. 86–95, 96–107. On August 11, 2016, Kevin D. appeared with counsel and testified at an administrative hearing before ALJ Brian Kilbane. R. 31–52. A vocational expert ("VE") also testified at this hearing. R. 52–60.

ALJ Kilbane issued an unfavorable decision on August 30, 2016. R. 14–23. At step two, he found that Kevin D. had a severe medical impairment of spine disorder, but found that Kevin D.'s "adjustment disorder with mixed anxiety and depressed mood" was a nonsevere impairment. R. 16–17. At step three, the ALJ determined that the spine disorder did not meet or equal the relevant Listing. R. 17–18. ALJ Kilbane then evaluated Kevin D.'s residual functional capacity ("RFC") and found that he could perform a reduced range of "light work"[2] as defined in

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b); *see* R. 18 n.1. A person who can meet these modest lifting requirements can perform light work only if he can also "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday" with intermittent sitting during the remaining two hours. R. 18 n.1; *see Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

the regulations, except that he could "stand and walk 4 hours in an 8-hour workday, sit for 6

hours in an 8-hour workday, [and] occasionally climb . . . stoop, kneel, crouch, and crawl." R.

18; *see also* R. 22–23. This RFC's exertional limitations ruled out Kevin D.'s return to his past

work as a correctional officer and warehouse manager. R. 21. Finally, based on this RFC finding

and the VE's testimony, ALJ Kilbane concluded at step five that Kevin D. was not disabled

because he still could perform widely available "representative light, unskilled occupations" such

as cafeteria cashier, gate guard, or mail routing clerk. R. 22; *see* R. 54–56. The Appeals Council

declined to review the ALJ's decision, R. 1–3, and this appeal followed.

### III. Discussion

Kevin D. makes three overarching arguments on appeal. *See generally* Pl.'s Br. 4–33,

ECF No. 14. First, he argues that ALJ Kilbane should not have evaluated his mental impairment

without first getting a medical opinion from a qualified psychiatrist or psychologist. *See id.* at 4–

10. He asserts that this opinion evidence is part and parcel of the "special technique" ALJs must

use to evaluate a claimant's mental impairment and that, as a layman, ALJ Kilbane could not

apply this technique without help from a qualified expert.[3] *See id.* at 5–8, 10. Second, Kevin D.

challenges the different weights ALJ Kilbane gave to conflicting medical opinions about his

remaining exertional capacities. *See id.* at 18–31. He also asserts that the ALJ did not properly

evaluate his credibility because he failed to mention Kevin D.'s "strong work history," *see id.* at

31–33, and overemphasized the type of Kevin D.'s daily activities without also considering

whether he could work on a regular and continuing basis. Finally, he takes issue with a purported

conflict between the ALJ's RFC finding that Kevin D. could stand and walk for at most four

hours in an eight-hour workday, R. 18, and his step-five conclusion that Kevin D. still could

---

[3] At oral argument, Kevin D.'s counsel asked to withdraw aspects of this argument. The Court granted
this request, but nonetheless will address the argument in full because it raises important questions about
an ALJ's obligations under the governing law.

perform certain "light" jobs or occupations, R. 22–23. *See* Pl.'s Br. 10–17. These arguments are
not persuasive.

A.     *Mental Impairment*

The Act and its implementing regulations instruct that, in any case where evidence
indicates the claimant has a mental impairment, "[a]n initial determination under subsection (a),
(c), (g), or (i) [of 42 U.S.C. § 421] shall not be made until the Commissioner of Social Security
has made every reasonable effort to ensure . . . that a qualified psychiatrist or psychologist has
completed the medical portion of the case review and any applicable [RFC] assessment." 42
U.S.C. § 421(h)(1); *accord* 20 C.F.R. §§ 404.1503(e), 416.903(e). Subsections (a), (c), (g), and
(i) describe four phases or levels of administrative review where an "initial determination" on a
claimant's disability claim might be made, *see Riniker v. Berryhill*, No. 16-cv-1035-KEM, 2018
WL 1558276, at *6 (N.D. Iowa Mar. 30, 2018), including on review by a state agency where the
claimant lives, 20 C.F.R. §§ 404.1503(a), 416.903(a); *see* 42 U.S.C. § 421(a).

When Kevin D. applied for benefits in November 2013, he alleged that he was disabled
because lumbar radiculopathy and lower back pain severely limited his physical capacities. *See*
R. 62, 66, 73, 77–78, 239–46. In forms submitted to DDS, he did not mention any psychological
symptoms or treatment, *see* R. 220–27, 237–38, 239–46, 267, and available medical records
contained no indication that he had an underlying mental disorder, *see, e.g.*, R. 296–307, 312,
319–24, 334, 366–85. On the contrary, Kevin D.'s mental status was within normal limits, R.
297, 300, 303, 306, 367, 370, 373, 375, and he repeatedly denied suffering from any abnormal
psychological symptoms, R. 291, 296, 299, 302, 305, 334, 367, 370, 373. Understandably, then,
the state agency did not have a mental health expert review Kevin D.'s records before making its
initial determination that he was not disabled, R. 62–72, 73–83. *See* 42 U.S.C. § 421(a)(1),

(h)(1); 20 C.F.R. §§ 404.1503(e), 416.903(e).

Kevin D.'s primary-care physician, James Isernia, M.D., *see* R. 48–49, first diagnosed an adjustment disorder with depressed mood on January 29, 2015, a few weeks after DDS denied Kevin D.'s claims on reconsideration, R. 86–95, 96–105, 403–04. *See* Pl.'s Br. 7. During that visit, Kevin D. told Dr. Isernia that he had felt "some stress lately" because his mother passed away recently and he was now caring for his father. R. 402, 404. Dr. Isernia observed that Kevin D. appeared "anxious" on examination, and he prescribed two medications to help with his depressed mood. R. 403–04. Later progress notes document Dr. Isernia's findings that Kevin D. appeared "anxious" and reported "some stressed feelings" on examination, R. 413, 418, 427, even when Kevin D. had specifically denied these symptoms and was doing well on prescribed medications, *see* R. 407, 411, 413, 426–27. In March 2016, Dr. Isernia diagnosed adjustment disorder with mixed anxiety and depressed mood, and noted that Kevin D. needed "some relaxation/coping mechanisms," R. 414, to help him deal with "stress eating" and the emotional demands of caring for his father, R. 411. Dr. Isernia also prescribed valium for Kevin D. to take as needed, R. 414, which he later reported "help[ed] to keep him calm," R. 407. Kevin D. did not mention any psychological symptoms or functional limitations when he testified at the administrative hearing in August 2016. R. 31–52.

All of this evidence was in the record presented to ALJ Kilbane, who considered it when evaluating Kevin D.'s medically determinable mental impairment. *See* R. 16–17, 27–28. Dr. Isernia merely diagnosed a mental disorder, and the record did not contain a medical opinion about the impairment's severity or functionally limiting effects. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) ("[A] diagnosis, without more, does not establish that [the claimant] suffers from any particular symptoms or limitations."). Thus, ALJ Kilbane either could

6

evaluate Kevin D.'s mental impairment based on the record before him, or he could supplement that record by asking a psychiatrist or psychologist to provide a medical opinion about the impairment. *See* 20 C.F.R. §§ 404.1519a, 404.1520a(e)(5), 416.919a, 416.920a(e)(5). ALJ Kilbane chose the first option. R. 17.

Kevin D. objects to this approach. He argues that in any case "involving evidence of a mental impairment," the "regulations unambiguously and absolutely require" the agency to "have a qualified psychiatrist or psychologist review the record evidence and offer an opinion" about the impairment's "practical effects" on the claimant's ability to work.[4] Pl.'s Br. 5. He also asserts that this opinion evidence is an indispensable "part of the 'special technique' . . . set forth in the regulations[,] which requires *expert assessment* of the claimant's mental limitations" at different stages of the disability determination process. *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)–(4)). Thus, he urges that the only proper course is to remand his case and direct the ALJ to fully "develop the record consistent with the regulations." *Id.*; *see also id.* at 9–10.

The regulations require agency decision makers "at each level of the administrative review process," including an ALJ at the hearing level, to apply a multi-step "special technique"

---

[4] In his brief, Kevin D. also suggests that the Act itself "provides that the Commissioner must make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable [RFC] assessment" whenever the case involves a mental impairment. *See* Pl.'s Br. 5–6 (quotation marks omitted) (citing 42 U.S.C. § 421(h)(1)). The statute's text makes clear that § 421(h)'s "every reasonable effort" requirement does not extend to cases where the only evidence indicating the existence of a mental impairment was presented first to an ALJ, and not to any of the agency officials charged with making "[a]n initial determination under subsections (a), (c), (g), or (i)," 42 U.S.C. § 421(h). *See Plummer v. Apfel*, 186 F.3d 422, 433 (3d Cir. 1999) ("Because 42 U.S.C. § 421(d), which covers hearings before an ALJ, is excluded from § 421(h)'s purview, an ALJ is not required to employ the assistance of a qualified psychiatrist or psychologist in making an initial determination of mental impairment."); *Rodgers v. Colvin*, No. 3:15cv1449, 2016 WL 4432678, at *8 (D. Conn. Aug. 17, 2016) (explaining that once the claimant's "application moved beyond the initial State agency review stage to the ALJ hearing stage," the "requirement described in [§ 421(h)] was no longer applicable" and the ALJ "was free to review [the claimant's] mental impairment herself, which she did"); *Felton-Miller v. Astrue*, No. 2:10cv5, 2010 WL 4809030, at *8 (E.D.N.C. Oct. 4, 2010) (citing *Plummer* for the same proposition), *aff'd*, 459 F. App'x 226, 231 (4th Cir. 2011) (per curiam).

when evaluating alleged mental impairments. 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see*

*Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. §

404.1520a(e)(4)). First, the ALJ determines whether the claimant produced sufficient evidence to

establish the existence of a "medically determinable mental impairment." 20 C.F.R. §§

404.1520a(b)(1), 416.920a(b)(1). Second, assuming the claimant clears the first step, the ALJ

must rate and document specific findings as to the resulting degree of limitation in each of four

broad functional areas. *Patterson*, 846 F.3d at 659. More specifically,

> [i]n the first three areas of functional limitations—(a) activities of daily living, (b)
> social functioning, and (c) concentration, persistence, or pace—the ALJ must rate
> the degree of limitation using "the following five-point scale: None, mild,
> moderate, marked, and extreme." The ALJ must rate the fourth functional area—
> (d) episodes of decompensation—using "the following four-point scale: None,
> one or two, three, four or more."

*Patterson*, 846 F.3d at 659 (quoting 20 C.F.R. § 404.1520a(c)(4)). Next, the ALJ determines at

steps two and three whether "the mental impairment is severe, and if so, whether it qualifies as a

listed impairment." *Id.* Finally, the ALJ must determine the extent, if any, to which the mental

impairment affects the claimant's RFC—i.e., his or her "maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-

8p, 1996 WL 374184, at *2 (July 2, 1996); *see* 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

"This RFC assessment is a holistic and fact-specific evaluation," *Patterson*, 846 F.3d at 659, that

must reasonably account for any impairment-related functional limitations the ALJ identified at

steps two or three of his decision, *see Mascio v. Colvin*, 780 F.3d 632, 638–39 (4th Cir. 2015)

(step three); *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *8–10 (W.D.N.C. Dec.

21, 2015) (step two).

Kevin D. concedes that ALJ Kilbane found the evidence in the hearing-level record

established that Kevin D. had "the medically determinable mental impairment of adjustment

disorder with mixed anxiety and depressed mood," Pl.'s Br. 7 (citing R. 17), which tracks Dr.

Isernia's diagnoses, R. 403, 408. He argues this threshold finding "mandated" that ALJ Kilbane

"have the case reviewed by a qualified [a]gency psychiatrist or psychologist," Pl.'s Br. 7,

because the special technique itself requires that a medical expert "interpret[] the raw medical

data" for the ALJ and offer a medical opinion about the claimant's specific mental limitations,

*id.* at 10. *See also id.* at 5, 8–9. This "interpretation of the regulations ignores their specific

guidance for the application of the 'special technique' to assess mental impairment at the ALJ

level." *Kennedy v. Astrue*, No. 5:08-cv-11, 2009 WL 605315, at *3 (E.D.N.C. Mar. 9, 2009).

"The regulations demand only that the technique be performed, not that a medical expert or

psychologist perform it." *Id.*; *see* 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4). Similarly,

although the ALJ "may return the case to the State agency" if he needs a medical expert's

assistance applying the special technique, 20 C.F.R. §§ 404.1520a(e)(5), 416.920a(e)(5), the

regulations' permissive language "makes clear that remand is discretionary rather than

mandatory," *Kennedy*, 2009 WL 605315, at *3. Kevin D.'s record contained enough evidence for

ALJ Kilbane to apply the special technique without help from a mental health expert. *See Felton-*

*Miller*, 459 F. App'x at 230–31; *cf. Bullock v. Astrue*, Civ. Action No. BPG-09-0112, 2010 WL

3060591, at *7 (D. Md. Aug. 3, 2010) ("[T]he medical evidence or record need only be complete

enough [for the ALJ] to make a determination regarding the nature, effects, and duration of a

claimant's [alleged] disability, and the claimant's RFC.").

 ALJ Kilbane's written decision also "document[ed] all of the special technique's steps."

*Patterson*, 846 F.3d at 659 (emphasis omitted). First, he rated the degree of limitation resulting

from Kevin D.'s mental impairment in the broad functional areas, 20 C.F.R. §§ 404.1520a(c),

416.920a(c), and found that he had "no restriction" in his activities of daily living, "no

difficulties" with social functioning and maintaining concentration, persistence, or pace, and had

suffered "no episodes of decompensation," R. 17 (citing R. 236–46). In making these findings,

he relied on Kevin D.'s own report that he managed his personal needs independently, went out

alone in public, visited with family and attended monthly social meetings, followed written

instructions "from beginning to the end," followed spoken instructions by "listen[ing] carefully,"

and had no trouble dealing with changes in routine or finishing what he started. R. 243–45; *see*

R. 17. These findings are also consistent with the longitudinal record, 20 C.F.R. §§

404.1520a(c)(1), 416.920a(c)(1), showing Kevin D.'s normal mental status examinations for

most of the relevant period, *see, e.g.*, R. 297, 300, 303, 306, 367, 370, 373, 375, and only mildly

abnormal findings on examinations after his mother passed away, R. 407, 411, 413, 426–27; his

positive response to common prescription medications, *see* R. 407, 411, 413, 426–27; and his

repeated failures to report that anxiety or depression caused any functional limitations in his

daily life, *see, e.g.*, R. 291, 296, 299, 302, 305, 334, 367, 370, 373, 407, 411, 413, 426–27.

Indeed, Kevin D. does not argue that the ALJ's ratings are unsupported by substantial evidence

in the current record, Pl.'s Br. 7–8, or "point to any specific piece of evidence not considered by

the [ALJ] that might have changed the outcome of his disability claim," *Reid v. Comm'r of Soc.

Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (emphasis omitted). He merely asserts that the ALJ

should have asked a mental health expert to review the medical record and provide an opinion

before the ALJ made those findings.

     Next, ALJ Kilbane concluded at step two that Kevin D.'s adjustment disorder with mixed

anxiety and depressed mood was a "nonsevere" impairment because it did "not cause more than

minimal limitation in [his] ability to perform basic mental work activities," R. 17, which

according to the regulations, include things like responding appropriately to other people,

following simple instructions, and dealing with normal workplace situations. 20 C.F.R. §§ 404.1521(b), 416.921(b) (2016). The ALJ's conclusion is supported by substantial evidence in the record and logically follows from the regulations' instructions that when an ALJ "rate[s] the degree of [a claimant's] limitation in the first three [broad] functional areas as 'none' or 'mild' and 'none' in the fourth area," he also "will generally conclude that [the] impairment(s) is not severe." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). ALJ Kilbane skipped the special technique at step three because "there was no reason for him to assess" whether Kevin D.'s nonsevere mental impairment met or equaled a Listing. *Vitrano v. Colvin*, No. 6:14cv51, 2016 WL 1032888, at *4 (W.D. Va. Mar. 15, 2016) (citing *Washington v. Astrue*, 698 F. Supp. 2d 562, 581 (D.S.C. 2010)); *see also* 20 C.F.R. §§ 404.1520a(e)(2), 416.920a(d)(2).

Finally, ALJ Kilbane noted that Kevin D.'s mental impairment did not cause more than minimal work-related limitations. *See* R. 17. Kevin D. correctly notes that the subsequent RFC finding "contains no mental health limitations." Pl.'s Br. 8; *see* R. 18. This is not particularly surprising given that ALJ Kilbane had already found Kevin D.'s nonsevere adjustment disorder did not in any way limit his functional abilities to perform normal daily activities, interact appropriately with other people, and maintain adequate concentration, persistence, or pace, R. 17. *See Neice v. Colvin*, No. 7:14cv24, 2015 WL 1169216, at *3 (W.D. Va. Mar. 13, 2015) ("Without a finding of a functional limitation, the ALJ was not required to add such a limitation to the RFC."); *Wilson v. Astrue*, Civ. No. SAG-12-313, 2013 WL 709824, at *3 (D. Md. Feb. 26, 2013) ("[The [RFC] regulations do not . . . require an ALJ to discuss a functional area where there is no limitation."). Again, Kevin D. merely objects that ALJ Kilbane should have asked a mental health expert for an opinion before making the RFC determination. Pl.'s Br. 7–8. He "does not identify any functional limitations that should have been included in the RFC

assessment or discus any evidence that would support the inclusion of any [mental] limitations."
*McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007).

Accordingly, I find no reversible error in ALJ Kilbane's evaluation of Kevin D.'s
nonsevere mental impairment.

B.    *RFC Determination*

Kevin D. makes two arguments challenging the ALJ's physical RFC determination. *See*
Pl.'s Br. 18–31, 31–33. A claimant's RFC represents his "maximum remaining ability to do
sustained work activities in an ordinary work setting on a regular and continuing basis" despite
his medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R.
§§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the
relevant evidence in the [claimant's] record," *Felton-Miller*, 459 F. App'x at 230–31, and it must
reflect the combined functionally limiting effects of impairments that are supported by the
medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio*, 780
F.3d at 638–40. The ALJ's written decision must "include a narrative discussion describing"
how medical facts and nonmedical evidence "support[] each conclusion" in the RFC
determination, *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously
probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir.
1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F.
App'x 199, 200 (4th Cir. 2017). This discussion should "build an accurate and logical bridge
from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir.
2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a
certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37.

1.    *Summary of the Relevant Evidence*

Kevin D. claims that he was disabled during the relevant period primarily because his lumbar degenerative disc disease caused intractable lower back pain and radicular symptoms that severely restricted his capacities to sit, stand, walk, and lift or carry more than a minimal amount of weight. He had a "minor" lumbar discectomy in 1999 and "did well" for several years until he started having "some pain" while working in a prison. R. 312; *see also* R. 332, 349. Kevin D. worked as correctional officer until late August 2011 when his back pain "flared up" again. R. 312; *see also* R. 42–43, 296, 332, 375. Different healthcare providers told Kevin D. not to return to this physically demanding job, *see* R. 297–98, 300–01, 303, 307, 312, 340–41, 350, 355, 356, while he tried increasingly aggressive measures to control his pain, *see* R. 312, 319, 320, 329, 345–48, 350. Initial treatments included medications, physical therapy, and one round of epidural steroid injections ("ESI") in January 2012. *See* R. 296–307, 315, 320–21, 327, 329–30.

In late March 2012, Kevin D. had a neurostimulator permanently implanted along his thoracolumbar spine. R. 345–48, 350. He had reported "70 percent or more relief of pain symptoms in his lower back and lower extremities" after a one-week trial the month before, R. 331, and he continued to experience "significant improvement in his low back pain" after the device was permanently implanted, R. 349. The pain was "worse with prolonged sitting" and "physical activity involving lifting movements," but "improved with his stimulator" and "the occasional use of . . . Lortab." R. 349; *see also* R. 352. In May 2012, Kevin D. visited Angel Medina-Bravo, M.D., for "recommendations on physical therapy so [he could] return to work" at a juvenile correctional facility. R. 349. Dr. Medina-Bravo opined that Kevin D. would benefit from physical therapy and core strengthening exercises to improve his pain and poor posture, and explained that he would "be able return to some employment in the near future" even if he was not completely "pain-free." R. 350. He did not think Kevin D. could return to his prior job at that

13

time. *Id.* On June 18, Kevin D. reported "considerable improvement i[n] abdominal strength and ability to lift, stretch, reach, and bend, though he [was] still very limited." R. 352 (punctuation corrected). On July 16, Kevin D. told Dr. Medina-Bravo that his pain and physical limitations had improved to the point that he felt ready to come off short-term disability. R. 356; *see also* R. 355 ("[P]atient reports that his low back pain is getting significantly better. Today he only has a pain 4/10. . . . [H]is radicular symptoms have also significantly improved."). He was "looking for alternate employment," but had "not yet been able to find a different job." R. 356. Dr. Medina-Bravo opined that Kevin D. was "making excellent gains with conservative treatment" and should continue his strengthening exercises and taking Lortab as needed for pain. *Id.*

Physical examinations before March 2012 generally revealed normal gait, posture, and lower extremity strength, R. 292, 297, 299–300, 305–06, 312, 320, 335; diffuse muscle spasms and tenderness along the lumbar spine, R. 297, 299–300, 312, 320, 335, 375; reduced range of motion in the back secondary to pain, R. 297, 299–300, 312, 320; and some radicular symptoms in the left lower extremity, R. 320, 375. One examination in September 2011 revealed "normal back range of motion [with] no loss of lumbosacral lordosis." R. 306. Kevin D. had negative straight-leg-raising tests when seated in September and December 2011, R. 306, 312, 335, and a positive test in the supine position at "about 20 degrees with left leg pain" in October 2011, R. 320. Diagnostic images taken around the same time showed "significant degenerative disk disease at L4-5 and L5-S1 with narrowing," R. 312, and "broad based disk bulges at L3-4, L4-5, and L5-S1 with varying degrees o[f] neural foraminal stenosis," R. 324. The spinal canal was "grossly patent at these levels." R. 324.

After March 2012, detailed musculoskeletal examinations generally revealed full strength in both lower extremities, R. 350, 355, 357; tenderness to palpation along the lumbar paraspinous

muscles, R. 350, 353, 355, 357; restricted range of motion in the lumbar spine secondary to pain,

R. 350, 353, 355, 357; and negative straight-leg-raising test on the right, but occasional positive

results on the left with reproduction of radicular symptoms, R. 350, 353. One of Dr. Medina-

Bravo's notes from June 2012 documents that Kevin D. walked "with a waddling wide-based

gait," but was "stable and safe" and did not need an assistive device. R. 353. Nerve conduction

studies of the bilateral lower extremities were normal. R. 350.

Kevin D. also saw Dr. Isernia during the relevant period. The first treatment note in the

record is from an annual check-up on November 1, 2011. R. 375. Kevin D. said he was "doing

OK," but he recently suffered a "twist and injury" to his lumbar spine that had exacerbated his

chronic "on and off" back problems. *Id.* Dr. Isernia noted on physical examination that Kevin D.

had lower back pain, spasms, and radicular symptoms. *Id.* He ordered some blood tests and told

Kevin D. to return in one year for his annual check-up. R. 376. The next note is from May 20,

2013, R. 372, about fourteen months after Kevin D. had the neurostimulator implanted, R. 345–

48, 350. Dr. Isernias's relevant findings on physical examination were the same as from the prior

visit, except that Kevin D.'s radicular symptoms had improved "some" with the neurostimulator.

R. 373. Under the "treatment" plan for lumbar degenerative disc disease, Dr. Isernia wrote

"check some labs; same meds and treatment; neurostimulator; permanent disability needed." *Id.*

On August 13, Kevin D. reported "4/10 ache/dull pain" in his lower back exacerbated by a recent

"flare." R. 370. The pain was "uncomfortable," but he was not taking any medications at the

time. *Id.* On exam, Dr. Isernia noted Kevin D. had lower back pain, spasms, and radicular

symptoms that he characterized as "some better with neurostimulator; now with a flare." *Id.*

Dr. Isernia recorded identical findings on physical exams in September 2013, February

2014, January 2015, and March 2015, *see* R. 367, 385, 403, 426–27, even though Kevin D.

specifically reported on those visits that his mild-to-moderate back pain had improved, *id.* ("[N]o meds recently 4/10 ache/dull pain; when the pain occurs; right now better."). *See also* R. 402 ("spinal cord stimulator works well with back pain and disc problems"). In September 2015, Dr. Isernia observed for the first time that Kevin D. had positive straight-leg-raising tests bilaterally in addition to the lower back pain, spasms, and improved radicular symptoms noted on prior exams. R. 418. He instructed Kevin D. to eat a healthy diet, exercise, lose weight, and use a reverse-traction inversion table to stretch his back. R. 419. Dr. Isernia also noted that Kevin D. should get a CT scan and "may need ESI/surgery." *Id.* In the meantime, he could take valium and another medication as needed. *Id.* In March and May 2016, Kevin D. reported that he had been taking care of his ailing father since his mother passed away and was doing "OK." R. 407, 411. On both visits, he described his musculoskeletal symptoms as "flare of some pain; no meds recently 4/10 ache/dull pain; when the pain occurs; right now better." R. 409–10, 413. Dr. Isernia did not note any relevant findings on examination. *See* R. 407–10, 411–15.

DDS physicians reviewed Kevin D.'s available records initially in May 2014, *see* R. 62– 72, 73–83, and on reconsideration in December 2014, *see* R. 86–95, 96–105. In May, Eugene Noland, M.D., opined that Kevin D. could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; sit for about six hours and stand/walk for four hours during a normal eight-hour workday; and occasionally climb, stoop, kneel, crouch, crawl, and push/pull with the left lower leg. R. 68–70, 79–80. In December, Robert McGuffin, M.D., identified the same exertional and postural limitations, but omitted the restriction on his ability to push/pull (up to twenty pounds) with the left lower extremity. *See* R. 91–92, 101–03. Drs. Noland and McGuffin both opined that the available evidence did not support a conclusion that Kevin D.'s lumbar degenerative disc disease was "a debilitating condition," R. 68, 79, 91, 101, in part because

medication and the permanent spinal cord "stimulator ha[d] helped" his back pain and radicular symptoms, R. 69, 80, 93, 103. *See also* R. 67, 78, 90, 100. They explained that their proposed RFCs for "light" work had been "reduced accordingly and remain[ed] with appropriate restriction to compensate for the impairments and associated symptoms that can be medically determined." R. 68, 79, 91, 101.

Dr. Isernia also completed two "Attending Physician's Statement of Functionality" forms for Kevin D. during the relevant period. R. 397–98 (Mar. 2014), 405–06 (Mar. 2015). Both forms are from the Hartford Life Insurance Company and were completed using "current information from [Kevin D.'s] most recent office visit or examination." R. 397, 405. Dr. Isernia noted that he first treated Kevin D. for lumbar degenerative disc disease on October 29, 2010, and that Kevin D. had followed up with him about once every six months over the past few years. *Id.* On both forms, Dr. Isernia opined that Kevin D. could stand and walk for thirty minutes each, for a combined total of one hour during an eight-hour workday; sit for two hours total during an eight-hour workday; frequently lift or carry up to ten pounds, but never anything greater; occasionally bend at the waist; and never kneel or crouch. R. 398, 406. He expected these restrictions would last a lifetime, *id.*, and he did not think Kevin D. could ever return to work, *see* R. 397, 405. Kevin D.'s "subjective symptoms" included low back pain, muscle spasms, and radiculopathy. R. 397, 405. Dr. Isernia did not identify any "physical examination findings" to support his opinions on the March 2014 form, R. 397, but the following year he wrote that his exam findings indicated Kevin D.'s permanent "spinal cord stimulator [was] working well," R. 405. Dr. Isernia's corresponding examination notes show that Kevin D. endorsed lower back pain, spasms, and somewhat improved radicular symptoms during these visits. R. 385 (Feb. 5, 2014), 427 (Mar. 30, 2015).

In August 2016, Kevin D. testified that the spinal cord stimulator had not provided

adequate relief and there was nothing else doctors could do to help him. R. 45–46, 51–52. He

took "[a]ll types of medications just to mask the pain." R. 44. He could sit for one or two hours

before needing to get up, stand for five or ten minutes before needing to sit down, walk for

fifteen or twenty minutes, and lift up to fifteen pounds. R. 50–51.

2.      *The ALJ's Decision*

ALJ Kilbane considered Kevin D.'s lumbar degenerative disc disease and pain-related

limitations throughout his written decision. *See* R. 16–21. At step two, he found that the spine

disorder was a "severe" impairment because it caused "more than minimal limitations in [his]

ability to perform basic work related activities," R. 16, which, according to the regulations,

include physical functions like sitting, standing/walking, and lifting/carrying, 20 C.F.R. §§

404.1521(b)(1), 416.921(b)(1). At step three, ALJ Kilbane noted that Drs. Noland and McGuffin

had both concluded this impairment did not meet the Listing for disabling degenerative disc

disease and that nothing added to the record since DDS completed its review in December 2014

warranted a different conclusion. R. 17–18 (citing 20 C.F.R. § pt. 404, subpt. P, app. 1 § 1.04).

He also found that Kevin D. had a "normal gait, posture, and station, and that he did not require

an assistive device for ambulation." *Id.*

Ultimately, ALJ Kilbane found that Kevin D. could perform "a limited range of light

work" insofar as he could occasionally lift/carry twenty pounds, frequently lift/carry up to ten

pounds, stand/walk for four hours during a normal eight-hour workday, and sit for about six

hours during a normal eight-hour workday. *See* R. 18 & n.1, 20. In crafting this RFC, ALJ

Kilbane summarized and weighed much of the evidence related to Kevin D.'s spine disorder,

including progress notes, treatment recommendations and results, findings on physical

examinations and diagnostic images, medical opinions, and Kevin D.'s statements both to his healthcare providers and in support of his disability claims. *See* R. 18–21. He found that Kevin D.'s spine disorder could reasonably be expected to cause his back pain and radicular symptoms, but that his statements describing the essentially disabling intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with" other evidence showing "limited abnormalities on clinical examination[s]"; generally "routine treatment" with noted "improvement of [his] back pain and radicular symptoms with medication and [the] spinal cord stimulator"; and Kevin D.'s ability to "perform[] a broad range of normal daily activities" like taking his wife to work, going out alone in public, caring for the family dog, and shopping in stores for 30 minutes at a time. R. 19–20. ALJ Kilbane also noted that although physical examinations showed "some instances of positive straight leg on the left," R. 19 (citing R. 350, 353), the record as a whole documented "negative straight leg raise, normal range of motion of the back without loss of lumbosacral lordosis, normal motor strength throughout, normal gait and station, full range of motion [in] the bilateral hips, . . . and intact sensation," *id.* (citing R. 292, 306, 320–21).

As for the medical opinions, ALJ Kilbane gave great weight to the DDS physicians' opinions "insofar as they restrict [Kevin D.] to a limited range of light work with 4 hours of standing and walking" because he found those opinions to be "balanced, objective," and "most consistent with the longitudinal" record. R. 20. In support of this conclusion, he cited specific medical exhibits showing that Kevin D.'s back pain and radicular symptoms improved after the spinal cord stimulator was implanted and that he had "normal gait, motor strength, and sensation on examination[s]." *Id.* (citing R. 292, 306, 312, 320–21, 425). ALJ Kilbane gave little weight to Dr. Isernia's treating-source opinion that Kevin D. should be limited to "less than a sedentary

range of work"[5] because he found that Kevin D.'s positive response to treatment and normal

gait, strength, and sensation on physical examinations "warrant[ed] finding less restrictive

limitations" than those Dr. Isernia identified. R. 21.

3.    *Analysis*

Kevin D. primarily challenges ALJ Kilbane's decision to credit the DDS physicians'

opinions over Dr. Isernia's medical opinions about his exertional capacities. Medical opinions

are statements from "acceptable medical sources," such as physicians, that reflect the source's

judgments about the nature and severity of the claimant's impairment, including his symptoms,

diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§

404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to each

medical opinion in the claimant's record, taking into account relevant factors such as the nature

and extent of the physician's treatment relationship with the claimant; how well the physician

explained or supported the opinion; the opinion's consistency with the record as a whole; and

whether the opinion pertains to the physician's area of specialty.[6] *Id.* §§ 404.1527(c), 416.927(c).

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet these very modest lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

[6] Kevin D.'s argument invokes aspects of the "treating physician rule," *see* Pl.'s Br. 18, 20–22, which sets out a special standard for ALJs to evaluate medical opinions from physicians who, by virtue of an established "treatment relationship" with the claimant, are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give a treating physician's medical opinion controlling weight, then he must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 256 (4th Cir. 2017). The ALJ "will always give good reasons" for the weight assigned to these opinions. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Although treating physicians' medical opinions deserve deference, the ALJ may discount or reject such an opinion when he relies on

A reviewing court "must defer to the ALJ's assignments of weight" among conflicting medical opinions unless the ALJ's underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) (citing *Hancock*, 667 F.3d at 472); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

ALJ Kilbane's decision survives this "deferential standard of review." *Dunn*, 607 F. App'x at 271. First, he plainly recognized that Dr. Isernia was a "treating source" under the regulations. *See* R. 21. Second, although he "did not explicitly analyze each of the [regulatory] factors on the record, the ALJ was clear that he concluded that the doctor's opinion was not consistent with the record or supported by the medical evidence, which are appropriate reasons," *Bishop*, 583 F. App'x at 67, to afford the opinion "significantly less weight," *Craig*, 76 F.3d at 590. *See* 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). Third, the ALJ made clear "'the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). Finally, "there is enough evidence in the record to support" the ALJ's findings and conclusions. *Dunn*, 607 F. App'x at 271.

As noted, ALJ Kilbane gave "little weight" to the essentially disabling exertional limitations that Dr. Isernia identified because he found them to be inconsistent with specific medical exhibits "showing improvement of [Kevin D.'s] back and radicular left lower extremity symptoms following [the March 2012] placement of a spinal cord stimulator and clinical findings showing normal gait, motor strength, and sensation on examination[s]" between August

---

"persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014); *Hines*, 453 F.3d at 563 n.2. Kevin D. asserts that ALJ Kilbane misapplied the law because he failed to consider Dr. Isernia's medical opinion against two of the five regulatory factors and did not give "good/specific/supported" reasons for the little weight he accorded the opinion. *See* Pl.'s Br. 18–20, 22, 31. At oral argument, Kevin D.'s counsel confirmed his argument was not intended to suggest that the ALJ should have given Dr. Isernia's medical opinion controlling weight. *See generally id.* at 18–31.

2011 and March 2015. R. 21 (citing R. 306, 312, 320–21, 425). Indeed, as ALJ Kilbane pointed

out in his summary, R. 19 (citing R. 412), Dr. Isernia repeatedly found that Kevin D.'s back pain,

muscle spasms, and radicular symptoms were "some[what] better" on physical examinations

after the spinal cord stimulator was implanted, *see, e.g.*, R. 367, 370, 373, 385, 403, 418, 426–27.

*Cf. Jones v. Colvin*, No. 5:12cv567, 2013 WL 5460197, at *12 (E.D.N.C. Sept. 30, 2013)

(concluding that the ALJ "properly relied on" the claimant's "testimony that her condition had

largely improved from medication and treatment," among other factors, in rejecting the "extreme

degree of limitation opined by [her] physicians"). And, although Dr. Isernia's notes do not

document any objective findings about Kevin D.'s gait or motor strength, other treating and

examining physicians did find that these physical capacities were generally within normal limits

throughout the relevant period. *See, e.g.*, R. 292, 297, 299–300, 305–06, 312, 320, 335, 350, 353,

355, 357. On this record, it was not unreasonable for ALJ Kilbane to conclude that Dr. Isernia's

opinion that Kevin D. had near-incapacitating exertional limitations was inconsistent with such

reported improvement and unremarkable findings on physical examinations. *See Sharp*, 660 F.

App'x at 258.

    Aside from alleging that ALJ Kilbane did not give "good/specific/supported" reasons for

discounting Dr. Isernia's opinion, Pl.'s Br. 18, 20, 22, 31, Kevin D. does not identify any

reversible error in the ALJ's analysis of the treating-source opinion. *See generally* Pl.'s Br. 22–

28 (summarizing treatment notes). Instead, he essentially urges the Court to reweigh the same

medical evidence that ALJ Kilbane considered and to conclude that the ALJ should have adopted

Dr. Isernia's functional assessments over the DDS reviewing physicians' less restrictive

opinions. *See id.* at 19–20, 22–28. This Court "cannot simply look at the same evidence and

reverse the ALJ on the basis that it could have reached a different result." *Carr v. Berryhill*, No.

6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017). "Thus, given the specific and
legitimate reasons provided, the ALJ was permitted to reject the treating physician's opinion in
its entirety." *Bishop*, 583 F. App'x at 67.

Kevin D. also briefly challenges ALJ Kilbane's decision to give "great weight" to the
DDS physicians' opinions that Kevin D. could lift up to twenty pounds, sit for about six hours in
an eight-hour workday, and stand/walk for at most four hours during the same time. Pl.'s Br. 29–
30; *see* R. 20–22. He asserts that the ALJ should not have relied on these opinions to support the
RFC determination because the DDS physicians did not have Kevin D.'s complete medical
record. Pl.'s Br. 29. An ALJ may credit a medical opinion from a non-examining physician
where the source adequately explains the opinion and it is consistent with the record as a whole.
*See Woods v. Berryhill*, 888 F.3d 686, 697 (4th Cir. 2018); 20 C.F.R. §§ 404.1527(c)(3)–(4),
416.927(c)(3)–(4). Here, Drs. Noland and McGuffin both noted that the available record did not
support a conclusion that Kevin D.'s lumbar degenerative disc disease was "a debilitating
condition," R. 68, 79, 91, 101, in part because medication and the spinal cord "stimulator ha[d]
helped" his back pain and radicular symptoms, R. 69, 80, 93, 103. *See also* R. 67, 78, 90, 100.
They explained that their proposed RFCs for "light" work had been "reduced accordingly" and
included "appropriate restriction[s]" to accommodate Kevin D.'s physical condition after the
1999 discectomy and 2012 "placement of [the] spinal cord stimulator with improvement in back
pain" and radicular symptoms in the left leg. R. 69, 80, 92, 102.

ALJ Kilbane acknowledged that the DDS physicians did not have any of the evidence
submitted after December 2014, R. 18, and he explained why their opinions were still the "most
consistent with the longitudinal review of the evidence" showing limited abnormalities on
physical examinations and Kevin D.'s consistent reports that his symptoms continued to improve

with relatively routine treatment, R. 20, especially after he received the spinal cord stimulator in

March 2012. Again, Kevin D. does not "point to any specific piece of evidence not considered

by the [ALJ] that might have changed the outcome of his disability claim," *Reid*, 769 F.3d at 865

(emphasis omitted). *See* Pl.'s Br. 29 (arguing that the DDS physicians might have changed their

RFC assessments if they had reviewed Dr. Isernia's opinions and later treatment records).

Accordingly, I find no reversible error in the weights ALJ Kilbane assigned to the conflicting

medical opinions.

Finally, Kevin D. objects that ALJ Kilbane did not acknowledge his "strong work

history," Pl.'s Br. 31, in explaining why Kevin D.'s complaints of disabling pain and limitations

were "not entirely consistent with" other relevant evidence in the record, R. 19. *See* Pl.'s Br. 31–

33. The regulations do require that any relevant information about the claimant's "work history

be considered as part of the RFC assessment." *Locker v. Berryhill*, No. 2:17cv342, 2018 WL

4232889, at *7 (E.D. Va. July 6, 2018) (citing 20 C.F.R. § 404.1529(c)(3)), *adopted by* 2018 WL

4224852 (E.D. Va. Sept. 5, 2018). ALJ Kilbane averred that he considered the entire record

when evaluating Kevin D.'s credibility, he noted that Kevin D. had worked as a correctional

officer and warehouse manager, and there is no indication that he ignored or misinterpreted

Kevin D.'s employment history when conducting this whole-record review. R. 16, 18–22; *see*

*Reid*, 769 F.3d at 865. ALJ Kilbane also gave specific, legitimate reasons why he concluded that

Kevin D.'s subjective complaints were "not entirely consistent with the medical evidence and

other evidence in the record," R. 19; *see* R. 19–20, and Kevin D. did not initially challenge any

of those reasons on appeal, Pl.'s Br. 31.[7] *See Bishop*, 583 F. App'x at 68 (finding no reversible

---

[7] At oral argument, Kevin D.'s counsel argued for the first time that ALJ Kilbane improperly focused on
the type of Kevin D.'s self-reported activities of daily living without also considering whether Kevin D.
could perform those activities on a regular and continuing basis. *See Woods*, 888 F.3d at 694 ("An ALJ
may not consider the *type* of activities a claimant can perform without also considering the *extent* to

error where "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's

credibility and averred that the entire record had been reviewed"). "[W]here, as here, the ALJ

provides legitimate reasons to question the severity of a person's report of symptoms, a good

work history will not overcome those reasons." *Weaver v. Colvin*, No. 3:15cv26, 2016 WL

4768841, at \*9 (W.D. Va. Sept. 13, 2016) (citing *Wheeler v. Colvin*, Civ. Action No. 1:13-445,

2014 WL 2157458, at \*14 (D.S.C. May 23, 2014)).

C.    *The ALJ's Step Five Conclusion*

Finally, Kevin D. takes issue with a purported conflict between the ALJ's RFC finding

that Kevin D. could stand and walk for at most four hours in an eight-hour workday, R. 18, and

his step-five conclusion that Kevin D. was not disabled because he still could perform certain

"light" jobs or occupations, R. 22–23. *See* Pl.'s Br. 10–17. He asserts that ALJ Kilbane

---

which [he or] she can perform them."). In January 2014, Kevin D. reported that constant lower back and leg pain severely restricted his abilities to sit, stand, and walk for even "short periods of time." R. 237; *see also* R. 244. He listed the daily activities he did or "attempted" to do "when able," such as cooking simple meals, going to the grocery store for 30 minutes, and doing light housework, but he also explained that he did not do these things very often because they exacerbated his pain. *See* R. 239, 241–43. ALJ Kilbane did not acknowledge these qualifying statements in concluding that Kevin D.'s ability to "perform[] a broad range of normal daily activities . . . suggest[ed] less limitation" than what Kevin D. had alleged. R. 20; *see* R. 19. Nor did ALJ Kilbane explain how the cited activities "showed that he could persist through an eight-hour workday" and a five-day workweek. *Brown*, 873 F.3d at 263. Accordingly, I cannot find that this reason independently supports the ALJ's adverse credibility determination. *Woods*, 888 F.3d at 694–95; *Brown*, 873 F.3d at 263. ALJ Kilbane also erred by relying on a single progress note from September 2011 to support his finding that the medical record "as a whole" documented "normal range of motion of the back" on physical examinations. R. 19–20 (citing R. 306). In fact, the longitudinal record overwhelmingly shows that Kevin D.'s lumbar range of motion was "limited" or "restricted" secondary to pain both before and after he received the spinal cord stimulator in March 2012. *See, e.g.*, R. 297, 299–300, 312, 320, 350, 353, 355, 357.

Both of these errors are harmless, however, because substantial evidence supports the ALJ's articulated rationale for why Kevin D.'s symptoms and alleged functional limitations were "not entirely consistent with" other relevant evidence in the record, *see* R. 19–20, and Kevin D. does not suggest that he might have been found disabled absent either error. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 697 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Moreover, Kevin D. did "not have to be pain-free in order to be found 'not disabled,'" particularly where, as here, the ALJ found that he could function only "at a lower exertional level," *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at \*4 (E.D. Va. Oct. 11, 2011) (citing *Hays*, 907 F.2d at 1457–58), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011), than he did before he stopped working, R. 21–22.

erroneously relied on "the Agency's 'light' Medical-Vocational Guidelines" without first considering whether the "sedentary" guideline would have been more appropriate in this case. Pl.'s Br. 11. The Medical-Vocational Guidelines ("the Grids") are published tables and administrative rules that can be used in certain cases to "direct[] a conclusion [at step five] as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a). The Grids help streamline the disability determination in these cases by providing competent evidence that there are (or are not) a significant number of jobs existing in the national economy that the claimant can perform considering his or her exertional RFC and vocational profile.[8] *See id.* § 200.00(a), (d). Because these rules are based solely on exertional capacities, however, the Commissioner may rely on the Grids alone to direct a finding of "Not Disabled" only in cases where the claimant retains the physical strength to perform "the full range of work at a given exertional level." *Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002). In all other cases, "the Grids may be used only as a guide," or framework, and "the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform." *Id.* at 147.

That is precisely what ALJ Kilbane did in Kevin D.'s case. First, he recognized that he could use Grid Rule 202.15 only as a "framework" to guide the disability determination because the RFC finding's four-hour standing/walking restriction did "not allow [Kevin D.] to perform the full range of light work." R. 23; *see also* R. 18 n.1, 21; 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.15 (directing a finding of "not disabled" for a person "closely approaching advanced age" with at least a high-school education and transferable skills who was limited to the full range of "light work"). At the hearing, ALJ Kilbane asked the VE whether there were any occupations

---

[8] The resulting figure is called "the person's remaining occupational base." SSR 83-12, 1983 WL 31253, at *1 (Jan. 1, 1983).

available to "a hypothetical person with the same age, education, and work history" as Kevin D.

if that person could "occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds,

stand or walk with normal breaks for a total of four hours in an eight-hour workday, and sit with

normal breaks for a total of about six hours in an eight-hour workday." R. 54 (spelling and

punctuation corrected); *see* R. 18, 22. The VE identified three "representative light" occupations

that such a person could perform, each of which offered at least several thousands of jobs in the

national and local economies. R. 54–55; *see* R. 22. He described these occupations as falling into

"a narrow range of modified light jobs" that require "less walking than the [full] light level," and

he specifically noted that the jobs numbers he listed had been adjusted to account for the four-

hour standing/walking restriction. R. 55–56; *see* R. 22–23. The VE also explained that the

*Dictionary of Occupational Titles* ("DOT") did "not separate light from sedentary work in

evaluating representative light jobs with reduced standing and walking,"[9] but that based on his

experience, it was his professional opinion that a hypothetical person with the ALJ's proposed

exertional RFC and Kevin D.'s vocational profile could perform the three light occupations he

---

[9] Aside from the amounts of weight lifted and carried, the "major difference between sedentary and light work is that most light jobs . . . require a person to be standing or walking most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires a total of six hours standing and walking during a normal eight-hour workday, SSR 83-10, 1983 WL 31251, at *5–6, whereas sedentary work requires a total of only two hours standing and walking during the same time, *Hancock*, 206 F. Supp. 2d at 768. *See* R. 18 nn.1–2. An RFC that allows the claimant to lift up to twenty pounds at one time, but restricts his total standing and walking to fewer than six hours during an eight-hour workday is often characterized as permitting a "reduced" or "limited" range of light work because the person's capacities for standing/walking fall in between what is needed to do sedentary work and what is needed to perform the full range of light work. *See Moore v. Comm'r of Soc. Sec. Admin.*, No. 5:16cv184, 2018 WL 993879, at *3 (N.D. W. Va. Feb. 21, 2018) ("[T]he ALJ appropriately found the plaintiff to be capable of performing a 'limited range' of light work, limited specifically in that she could stand and walk for no more than four hours."); *Hensley v. Colvin*, No. 5:13cv27810, 2015 WL 566626, at *17–19 (S.D. W. Va. Feb. 10, 2015) (explaining that a two-hour standing/walking restriction falls within the definition of "a reduced range of light work" and does not compel the conclusion that the claimant could "only perform sedentary work" (collecting cases holding the same)); *Neal*, 2010 WL 1759582, at *2 (explaining that a four-hour standing/walking restriction "exceed[s] the definition of sedentary work" because it permits the claimant to "stand or walk for more than two hours per workday," but "fall[s] short of the full range of light work because [the claimant] cannot stand or walk for six hours per workday"). ALJ Kilbane recognized this distinction throughout his written decision. *See* R. 18, 20, 22, 23.

had already identified. R. 22; *see* R. 55–56, 58. ALJ Kilbane accepted the VE's explanation in

concluding at step five that Kevin D. was not disabled. *See* R. 22–23 (citing *Pearson v. Colvin*,

810 F.3d 204 (4th Cir. 2015)).

Kevin D. asserts that this "is not the complete analysis required under Agency policy" in

cases where the claimant's RFC "falls between" the exertional demands of "light and sedentary

work and the distinction is outcome determinative." Pl.'s Br. 13, 14 (citing SSR 83-12, 1983 WL

31253). Social Security Ruling ("SSR") 83-12 instructs ALJs how to use the Grid Rules as a

"framework" for resolving disability claims when the "individual's exertional RFC does not

coincide with the definition of any one of the ranges of work" in 20 C.F.R. §§ 404.1567 and

416.967. *See* 1983 WL 31253, at *1, *2. When this discrepancy occurs, "the occupational base is

affected and may or may not represent a significant number of jobs in terms of the rules directing

a conclusion as to disability." *Id.* at *2. Thus, the ALJ "will consider the extent of any erosion of

the occupational base and assess its significance" in resolving the person's claim. *Id.* (spelling

corrected). The Ruling also specifically contemplates that determining "the sufficiency of the

remaining occupational base" may require "more difficult judgments" when two potentially

applicable Grid Rules "would direct different conclusions[] and the individual's exertional

limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges

of work . . . ." *Id.* at *3. An ALJ faced with "these contradictory outcomes," *Neal*, 2010 WL

1759582, at *2, should consult a VE to help him "make an individualized determination" about

the claimant's ability to perform work that exists in the national or regional economy, *see*

*Bradshaw v. Berryhill*, No. 1:16cv969, 2017 WL 962768, at *5–8 (E.D. Va. Feb. 3, 2017),

*adopted by* 2017 WL 958105 (E.D. Va. Mar. 9, 2017), *and aff'd* 704 F. App'x 266 (4th Cir. Nov.

28, 2017) (per curiam). *See* SSR 83-12, 1983 WL 31253, at *2–3 (explaining that the Ruling

"provide[s] a basis for equitable consideration of the remaining occupational base" and advising ALJs to consult a VE whenever "more difficult judgments are involved" in resolving this question). The Commissioner may rely on a VE's dependable testimony to shoulder her burden at step five. *See Golini v. Astrue*, 483 F. App'x 806, 807–08 (4th Cir. 2012).

Kevin D. does not directly challenge ALJ Kilbane's reliance on the VE's testimony in this case. Instead, he interprets SSR 83-12 as imposing a threshold requirement that the ALJ expressly "determine whether there has been a 'significant reduction' in the claimant's ability to perform light work" and, if so, that the ALJ apply the more "appropriate" sedentary Grid Rule to direct a finding that the claimant is disabled. Pl.'s Br. 14 (emphasis omitted); *see id.* at 12–17. This argument relies on language advising ALJs to consider the possibility that, "if the [claimant's] exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of 'Disabled.'" SSR 83-12, 1983 WL 31253, at *2; *see* Pl.'s Br. 14–17. That equitable policy does not dictate the result where, as here, the ALJ uses the Grid Rules only as a framework and relies instead on "the testimony of a vocational expert to determine whether the claimant has the ability to perform *specific* jobs that exist in the national economy." *Bradshaw*, 2017 WL 962768, at *5–6 (emphasis added); *see also Dennis v. Berryhill*, No. 2:17cv529, 2018 WL 34325544, at *7–9 (E.D. Va. June 20, 2018) (rejecting plaintiff's argument that the ALJ must conduct a "special analysis" or "specifically calculate erosion in the light occupational base to ensure that a finding was not directed by the [sedentary] Grid Rules" where the ALJ properly relied on a VE's testimony in concluding that the plaintiff's RFC and vocational profile allowed her to perform one "light" occupation offering a significant number of jobs in the national economy), *adopted by* 2018 WL 3431973 (E.D. Va. July 16, 2018); *Neal*, 2010 WL 1759582, at *2–3. In short, the

legal label attached to the RFC's exertional restrictions is not significant when the VE's reliable

testimony provides competent evidence that the claimant is not disabled. *See, e.g.*, *Golini*, 483 F.

App'x at 807–08; *Dennis*, 2018 WL 34325544, at *9; *Bradshaw*, 2017 WL 962768, at *5–6.

Considering the ALJ's adequately supported RFC determination, the VE's testimony that

a hypothetical person with those exact same exertional capacities could perform specific

representative occupations categorized as "light" work, and the ALJ's reasonable resolution of

an apparent conflict between the VE's testimony and the DOT, substantial evidence supports the

ALJ's concordant step-five conclusion that Kevin D. was not disabled within the meaning of the

Act. *See Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) (per curiam) ("Because the

ALJ's [RFC] determination is supported by substantial evidence and because the challenged

hypothetical question merely incorporated that determination, the ALJ committed no error.");

*Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (noting that the "ALJ was entitled to rely

on the VE's calculations" to support his step-five conclusion where the "ALJ consulted with

[the] VE about the implications of the [RFC determination's] sit/stand option on the occupational

base and the VE adjusted certain job categories accordingly").

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's

final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT**

the Commissioner's Motion for Summary Judgment, ECF No. 17, **AFFIRM** the Commissioner's

final decision, and **DISMISS** the case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: December 26, 2018

Joel C. Hoppe
United States Magistrate Judge

31